IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH - CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>SAMUEL RAY WILGUS,<br><br>　　　　Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No: 2:99-CR-00047<br>Assoc. Case No.: 2:99-CR-00166<br>Assoc. Case No.: 2:00-CR-00029 |

In 1990 the United States Supreme Court held that an otherwise valid law of general application that incidentally imposed a burden on the practice of a particular religion did not offend the free exercise clause of the First Amendment. *See Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990). Characterizing *Smith* as an unwarranted departure from well-established free exercise jurisprudence, Congress retaliated by passing the Religious Freedom Restoration Act (RFRA) of 1993. 42 U.S.C. § 2000bb *et seq*. A certain amount of edifying back-and-forth between the legislative and judicial branches ensued. For present purposes, the result of that interaction is that RFRA's reinstatement of the strict scrutiny test governs this Court's consideration of federal laws permitting Native American practitioners of Native American religions to possess eagle feathers for religious purposes but forbidding non-Native American adherents of the very same religions from likewise possessing eagle feathers. If the federal government imposes a substantial burden on the free exercise of religion, as the government concedes it has done in this case, the government action creating the burden will fall

afoul of RFRA unless the government can demonstrate that the burden

> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb-1(b).  In other words, "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion."  *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972).  In order to show that its compelling interests "cannot otherwise be served," the government must demonstrate that it has explored other possible means of advancing its goals and found that they would not serve.  *See Spratt v. Rhode Island Dept. of Corrections*, 482 F.3d 33, 41 (1st Cir. 2007); *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005).  Satisfying the least restrictive means test does not require the government to consider every conceivable alternative, however unwieldy or ineffective, *see Hamilton v. Schriro*, 74 F.3d 1545, 1556 (8th Cir. 1996), but the government must, at a minimum, refute options put forward by the parties.

The burden of showing that the means employed are the least restrictive practicable is a heavy one, and various types of evidence can demonstrate that the reverse is true.  For instance, the existence of government-sanctioned exceptions to a scheme purporting to be the least restrictive one possible can show that other, less-restrictive alternatives could be envisaged.  *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal et al.*, 546 U.S. 418, 126 S.Ct. 1211, 1221–22 (2006) (existence of exceptions to statutory scheme for one religious group demonstrated inadequacy of government's contention that similar exception to different religious group defeated government's compelling interest in uniform enforcement).  Exceptions for some groups or interests to a government scheme that substantially burdens religious practice make it

difficult for the government to show that its restrictions on religious practice are the least restrictive means of pursuing its goals.  In other words, the government cannot justify the religious restrictions created by a policy as necessary to further the policy's aims if that same policy is riddled with exceptions to promote the interests of other religious practitioners or other non-religious interests.

The government argues that its interests in protecting eagle populations and Native American culture are compelling interests that cannot be served by any means less restrictive than those currently employed.  The government attempts to advance its compelling interests through the Bald and Golden Eagle Protection Act and the Migratory Bird Treaty Act, both of which prohibit the possession of eagle feathers.[1]  16 U.S.C. § 668(a); 16 U.S.C. § 703(a).  Each Act, however, authorizes the Secretary of the Interior to determine whether and what exceptions to allow to this general prohibition.  16 U.S.C. § 668a; 16 U.S.C. § 704.  Pursuant to this authority, the Secretary has promulgated regulations[2] authorizing enrolled members of federally recognized Indian tribes to possess bald and golden eagle feathers for religious purposes.[3]  50

---

[1]The Bald and Golden Eagle Act prohibits possession and other acts involving "any bald eagle . . . or any golden eagle, alive or dead, or any part, nest, or egg thereof."  16 U.S.C. § 668(a).  The Migratory Bird Treaty Act proscribes possession or other acts with regard to "any migratory bird, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof."  16 U.S.C. § 703.  "Feathers" is employed in this opinion as a synecdoche for any part of an eagle or an eagle as a whole.

[2]The Bald and Golden Eagle Protection Act and the Migratory Bird Treaty Act share a single set of regulations.

[3]Additional regulations exist for museums and zoos to take or possess eagles for scientific and exhibition purposes, 50 C.F.R. § 22.21; to prevent depredation on livestock or damage to agriculture, 50 C.F.R. § 22.23; for falconry, 50 C.F.R. § 22.24 (limited to golden eagles); and, under some circumstances, golden eagle nests that interfere with resource development, 50 C.F.R. § 22.25.

C.F.R. § 22.22.  In order to obtain feathers for religious purposes, enrolled members of federally

recognized tribes must apply for a permit from the National Eagle Repository in Commerce City,

Colorado.[4]  State and federal wildlife officials send any dead eagles or loose feathers they find to

the Repository, where staff evaluate them and prepare them for distribution.  Neither Act allows

possession of eagle feathers for religious purposes by non-Native Americans, who may neither

apply to the Repository directly nor receive Repository feathers from a Native American permit

holder.[5]

        This presents a problem for those non-Native Americans who have adopted the religious

beliefs and practices of Native Americans but who cannot legally possess the eagle feathers that

play a significant role in many Native American religions.  Both Defendants in this case occupy

that unenviable position.[6]  Although not of Native-American ancestry, Samuel Wilgus has

practiced a Native-American religion for a number of years.  After the collapse of his first

marriage in the mid-1980s, Mr. Wilgus went to Cedar City, Utah to live with Wilford Jake and

---

[4]Permits are not required for eagle feathers acquired before the passage of the Bald Eagle Protection Act, June 8, 1940, or before golden eagles were included in its protections, October 24, 1962.  50 C.F.R. § 22.2.  It is, in other words, lawful to possess feathers acquired before the Acts were passed.  *See United States v. Hardman*, 297 F.3d 1116, 1122 (10th Cir. 2002) (en banc).

[5]A permit issued by the Repository allows the holder to possess the feathers associated with the permit; it does not permit transfer of the feathers except when they are "handed down from generation to generation or from one Indian to another in accordance with tribal or religious customs."  50 C.F.R. § 22.22.

[6]The two cases before this Court were consolidated with a third from the District of New Mexico for purposes of rehearing en banc.  The New Mexico case was affirmed and forms no part of the discussion here.  After remand, however, the cases of Mr. Hardman and Mr. Wilgus were consolidated with a third, that of Christopher and Faye Beath.  The Beaths, however, pleaded guilty on June 19, 2007, and the differences in procedural posture and substance between their case and the two currently before the Court need not be considered.  "Defendants" in this case refers only to Mr. Hardman and Mr. Wilgus.

his family, who are enrolled members of the Southern Paiute Nation.  Mr. Wilgus was raised in a

Baptist church, but while living among the Paiute his "spiritual practices and beliefs evolved."

Wilgus Aff. ¶ 3, Dkt. No. 98, Case No. 2:99-CR-00047.  Mr. Wilgus became a blood brother to

Wilford Jake and received religious training from Mr. Jake and his brother Clifford, then a Road

Man of the Native American Church.  Clifford appointed Wilford to be his successor and

Wilford Jake is now an elder spiritual leader in the region in which he lives.  Jake Aff. ¶ 7, Dkt.

No. 99, Case No. 2:99-CR-00047.  So sincere was Mr. Wilgus's commitment to his new faith

that after a time Wilford Jake presented him with a large eagle feather to honor Mr. Wilgus's

service as a fireman in the Native American Church and to recognize his progress in his religious

training.

Even as his religious activities culminated in gifts of feathers, his work soon began to

yield such gifts as well.  Mr. Wilgus received feathers from a member of the Sioux Nation in

Montana "in recognition and thanks for Mr. Wilgus's services to him while [Mr. Wilgus] was

Native American Support Group Advisor at Clearfield Job Corps, Clearfield, Utah."  Wilgus Aff.

¶ 4.  The other Native American Support Group Advisor at Clearfield, a member of the Ute

Tribe, gave Mr. Wilgus a number of "small Eagle feather fluffs . . . in friendship and in

recognition of my dedication to the feather and the group."  *Id.* ¶ 5.  The Dogmen, a religious

society of the Blackfoot Nation in Lethbridge, Canada, sent Mr. Wilgus two additional feathers

"for service to a member of the Blackfoot Nation" during Mr. Wilgus's tenure with the

Clearfield Job Corps.[7]  Now well supplied with feathers, Mr. Wilgus apparently pursued his

---

[7]While Mr. Wilgus appears to attach religious significance to his possession of all these
feathers, on his own account only the first was given to him for religious reasons.  One is
enough, however, to avoid questions regarding the relative weight of the religious intentions of

religious practices in peace until a traffic stop—so often a catalyst for the development of the criminal law—intervened.

On June 5, 1998, a Utah Highway Patrol officer pulled over a speeding truck in which Mr. Wilgus was a passenger.  Aff. in Supp. of Misdemeanor Information, Dkt. No. 1, Case No. 2:99-CR-00047.  Observing what appeared to be drug paraphernalia, the officer asked for and received consent to search the truck and found 137 eagle feathers in a box in the bed of the truck.  *Id.*  When Mr. Wilgus was unable to produce a permit authorizing him to possess the feathers, the officer confiscated them.  *Id.*  Another officer visited Mr. Wilgus's house in Layton, Utah, and his wife gave the officer four additional feathers.  *Id.*  During the subsequent investigation, Mr. Wilgus insisted that he was an adopted member of the Paiute Tribe, but, when contacted, the Chairperson of the Paiute Indian Tribe of Utah contradicted Mr. Wilgus's account, explaining that Paiute law does not permit the adoption of non-Native American persons.  *Id.*  Mr. Wilgus conceded this point when his case was on appeal to the United States Court of Appeals for the Tenth Circuit.  297 F.3d 1116 at 1119 n.3.

In February 1999, Mr. Wilgus was charged in a two-count misdemeanor information with the possession of 141 eagle feathers in violation of the Bald and Golden Eagle Protection Act, 16 U.S.C. § 668(a).  Mr. Wilgus entered a conditional guilty plea to both counts on November 4, 1999, and was sentenced to pay a $50 special assessment fee and to twelve months' probation. Dkt. No. 38, Case No. 2:99-CR-00047.  Mr. Wilgus appealed his conviction to the Tenth Circuit Court of Appeals, claiming violations of the free exercise and establishment clauses.  A divided

---

giver or giftee in determining whether the free exercise of religion has been burdened.  Nor need the Court consider whether a cultural, as opposed to a religious, transfer of feathers, e.g., as a thank-you gift, ought to be analyzed in the same manner as a religious practice.

panel affirmed his conviction, but the opinion of that panel was issued and vacated simultaneously, and Mr. Wilgus's case was ordered to be re-heard en banc with that of Mr. Hardman and a similar case from the District of New Mexico. *United States v. Hardman*, 260 F.3d 1199 (10th Cir. 2001).

Like Mr. Wilgus, Defendant Raymond Hardman has been a practitioner of a Native American religion for some years. And, like Mr. Wilgus, Mr. Hardman found that divorce ultimately brought his denominational preferences into conflict with the enforcement of federal eagle protection law. For Mr. Hardman, indeed, the causal connection between divorce and federal charges is even more direct. While he cannot lay claim to Native American ancestry himself, Mr. Hardman was at one time married to an enrolled member of the S'Kallum Tribe; the couple's two children are also enrolled members of the S'Kallum Tribe. In 1993, Mr. Hardman's son's godfather died and Mr. Hardman transported the body in his truck to Arizona for religious rituals. As part of those rituals, a Hopi religious leader gave Mr. Hardman a bundle of prayer feathers to keep in his truck; the bundle included golden eagle feathers. Mr. Hardman attempted to obtain a permit for these feathers from the Utah Division of Wildlife Resources, but was informed that he was ineligible to apply because he was not a member of a federally recognized tribe. No enforcement efforts appear to have been made, however, until after Mr. Hardman and his wife separated and his now-estranged wife, finding, perhaps, that her commitment to her erstwhile husband's spiritual development had, to a degree, diminished, notified a Ute tribal official that Mr. Hardman possessed eagle feathers without a permit.

Mr. Hardman was charged in federal court with a violation of the Migratory Bird Treaty Act, 16 U.S.C. § 703, and was convicted in 1999 following a bench trial before a magistrate

judge.  The district court affirmed his conviction and Mr. Hardman appealed, arguing selective

and discriminatory prosecution in violation of his equal protection rights, violation of his free

exercise rights, and that the statutory and regulatory schemes governing the possession of eagle

feathers for religious purposes constituted an unconstitutional establishment of religion.  Mr.

Hardman obtained the same initial result on appeal as Mr. Wilgus: a conviction affirmed by a

divided panel in an opinion immediately vacated for re-hearing en banc.  *United States v.*

*Hardman*, 260 F.3d 1199 (10th Cir. 2001).

On rehearing en banc the Tenth Circuit Court of Appeals determined that both cases were

controlled by RFRA.  The en banc court determined that the general prohibition on possessing

eagle feathers, combined with an exception for Native-American religious uses, represents an

effort to further two government interests: the protection of eagles and the protection of Native

American religions and cultures.  The Tenth Circuit found both of these interests to be

compelling, but remanded the cases for this Court to develop a factual record with regard to each

interest, and to determine whether the government's eagle-feather program is the least restrictive

means of furthering these compelling interests.  The factual task on remand with regard to eagles

is straightforward: the government is to provide evidence regarding national populations of

eagles and population trends.  *Hardman*, 297 F.3d at 1133, n.21.  The government is also to

show whether there has been an increase in the number of eagle feathers available as a result of

recovering eagle populations and to project the effect any such increase would have on wait

times at the repository.  *Id*. at 1133.  The requisite facts concerning the government's interest in

protecting Native American culture are less straightforward: the government is to provide "hard

evidence that there are substantial numbers" of non-Native American adherents of Native

American religions who could be expected to apply in such numbers that "broader eligibility would result in an increased wait substantial enough to endanger Native American cultures." *Hardman*, 297 F.3d at 1133. The en banc majority also considered the possibility that fostering the religious practices of non-Native American adherents could foster Native American religion by exposing a more varied group to it, thereby furthering the government's compelling interest. *Id*.

This factual record is then to inform this Court's determination of whether the government's policies further its compelling interests in protecting eagles and native American culture by the least restrictive means possible. Answering this question requires determining whether any alternative regulatory scheme could further those interests in a manner less inimical to the free exercise rights of Mr. Hardman and Mr. Wilgus as protected by RFRA. The government's policies—and this Court's analysis of them—must take account of the fact that the government's two interests are not only compelling, but competing. In the interests of eagle protection, the Repository system imposes significant burdens, in the form of delays, limitations in supply, and sometimes in quality of feathers, on Native Americans. *See United States v. Friday*, 525 F.3d 938, 944 (10th Cir. 2008). In the interest of fostering Native American religions, the government permits Native American possession of eagle feathers, creating enforcement problems that hinder the protection of eagles. Thus the government must balance its competing interests so as to promote each to the greatest extent possible without disproportionately harming the other. The government's scheme must, in other words, "properly set [its] interests in equipoise." *United States v. Hardman*, 297 F.3d 1116, 1135 (10th Cir. 2002) (en banc). "Properly," in this context comprehends the balance between the two interests in

addition to ensuring that balance intrudes to the smallest extent possible on the free exercise of individuals situated as are the defendants in this case.

Defendants maintain that the government has not selected the least restrictive means available of furthering its interests in imposing a flat ban on possession of eagle feathers by any but Native American adherents of Native American faiths. The simplest means of eliminating the burden is to drop the ban on possession by non-Native American adherents of Native American faiths and to let all adherents, regardless of tribal status, apply to the Repository for feathers and permits to possess them:

> What is questioned is how those permits are distributed. The question at the heart of this case is why an individual who is not a member of a federally recognized tribe is foreclosed from applying for a permit that may be used as a defense to criminal prosecution for possession of eagle feathers, while an <u>identically situated</u> individual may apply for a permit if she is a member of a federally recognized tribe.

*Hardman*, 297 F.3d at 1135 (emphasis added).[8]  This alternative would unquestionably ease the government-created burden on non-Native American adherents of Native American religions. But to determine whether it is possible to ease that burden without compromising the government's two compelling interests, it is necessary to consider the nature of those interests and how recent developments have altered the measures necessary to advance them.

After the case was remanded, this Court has heard testimony over several days from numerous witnesses and has accepted the uncontested affidavits of them and many others. The

---

[8]In his affidavit, Mr. Wilgus suggests that non-Native American adherents' access to feathers could be mediated by tribal religious leaders who already have access to Repository feathers and who could—if the flat ban on possession by non-Native Americans were eliminated—distribute feathers to whomever they deemed worthy.  Wilgus Aff. ¶¶ 9–10, Dkt. No. 98, Case No. 2:99-CR-00047.  This alternative scheme is discussed below.

parties have twice briefed the question whether the government is employing the least restrictive means in banning possession of eagle feathers by non-Native American adherents to Native American religions.  The Court has also conducted a variety of hearings setting procedure and resolving procedural and other legal questions.

### *Promoting Native American Religion and Culture*

The Tenth Circuit Court of Appeals had "little trouble finding a compelling interest in protecting Indian cultures from extinction, growing from government's historical obligation to respect Native American sovereignty and to protect Native American culture."  *Hardman*, 297 F.3d at 1128.  The contours of that interest, however, are rather more complex.  The en banc majority recognized that "Native American religions are rich in variety" and that the dispute in this case is directly relevant only to those tribal religions holding eagle feathers to be sacred. The chief effect of alternatives to the current permitting scheme appeared (in light of the factual record as it then stood) to be increased wait times to receive feathers from the Repository. *Hardman*, 297 F.3d at 1127, n.17.  The evidence now before the Court, however, demonstrates that the interests of the groups holding eagle feathers sacred are varied, often contradictory, and not limited to the problem of (possible) increases in wait times.

Native American religions are neither hierarchical nor homogenous, and there is considerable disagreement among tribes holding eagle feathers sacred regarding the appropriate role—if any—of persons who are not tribal members in tribal worship.  The stakes for Native Americans—and for the government's interest in preserving their culture—appear significant, since the practice of traditional religions by Native Americans has increased since the 1960s as

11

part of an effort to "maintain, strengthen, and in certain instances re-establish, their cultural identity." Aff. of Dr. Raymond Bucko ¶ 3, Dkt. No. 68-6, Case No. 2:99-CR-00047. According to Dr. Bucko, "Native religion [is] the single primary focus around which Native peoples maintain and strengthen their cultural identity," *id*., and is "according to Native reckoning, the last unique cultural attribute possessed by many tribes," *id*. ¶ 10. But while the record speaks with one voice as to the importance of traditional religious practices to tribes, there is no single answer as to whether permitting non-Native American adherents to practice Native American religions furthers or frustrates the government's interest.

There is abundant evidence in the record that some tribes do not welcome the participation of non-Native Americans in traditional Native American religious practices. A spiritual leader of the Lakota tribe, for instance, in conjunction with spiritual leaders from Cheyenne, Arapahoe, Nakota, and Dakota tribes[9] held a meeting in March 2003 to discuss the "protection from the abuse and exploitation of our ceremonies." Statement of Chief Arvol Looking Horse, Appx. 1, Aff. of Dr. Raymond Bucko, Dkt. No. 68-6, Case No. 2:99-CR-00047. The result of that meeting was an uncompromising statement on the importance of restricting participation in the most sacred Native American religious rituals to Native Americans:

> It was decided, from March 9th, 2003 and forward, there will be no non-Natives allowed in our sacred Ho-c o-ka (our sacred altars) where it involves our Seven Sacred Rites. The only protection with this decision in Government law; is that only enrolled members can carry an eagle feather. . . . The eagle feather stands for Indigenous knowledge and guidance in our spiritual ways . . . The only participants allowed in the center [for the Sundance Ceremony] will be Native People. The non-Native people need to understand and respect our decision . . .

---

[9]It is not clear from the record whether only leaders from these tribes agreed with the statement issued by Chief Arvol Looking Horse or whether the leaders from the Ogallala and Cree tribes in attendance were in agreement as well.

> Our purpose for the Sundance is for the survival of the future generations to come, first and foremost.  If the non-Natives truly understand this purpose, they will also understand this decision and know that by their departure from this Ho-c o-ka is their sincere contribution to the survival of our future generations.

*Id*.  At least some tribal leaders perceive the ban on possession of eagle feathers by non-Native Americans as directly advancing their efforts to survive: "Native people consistently point to the laws restricting the possession of protected bird species parts solely to Native people as an instance of Government protection of the integrity of Native religions."   Aff. of Dr. Raymond Bucko ¶ 9, Dkt. No. 68-6, Case No. 2:99-CR-00047.   Indeed, one Cherokee author treats the restriction of Native American cultural practices to Native Americans as essential to the survival of Native American culture:

> It may be too hard to face the consequences of history; it may even be harder to change them.  As long as the substitute impersonation works to shield from the truth, playing Indian serves its deadly purpose, and, as I have said elsewhere, Indians are in effect, loved to death through playing Indian, while despised when they want to act out their real traditional roles on the American Landscape. For Indians to be Indians, or rather to be Indian in their some 200 distinct tribal roles, to be Indian in the historical future, non-Indians must give up the role.

Rayna Green, "The Tribe Called Wannabe," Folklore 99(1): 30–55 (1988), *quoted in* Aff. of Dr. Raymond Bucko ¶ 9, Dkt. No. 68-6, Case No. 2:99-CR-00047.  The efforts of non-Native American adherents to adopt Indian religions become in this analysis an extension of imperialism:

> While New Agers may think that they are escaping white racism by becoming 'Indian,' they are in fact continuing the same genocidal practices of their forebears.  The one thing that has maintained the survival of Indian people through 500 years of colonialism has been the spiritual bonds that keep us together. . . . Many white New Agers continue this practice of destroying Indian spirituality.  They trivialize Native American practices so that these practices lose their spiritual force, and they have the white privilege and power to make themselves heard at the expense of native Americans.  Our voices are silenced, and consequently the younger generation of Indians who are trying to find their

13

way back to the Old Ways becomes hopelessly lost in this morass of consumerist spirituality.

Appx. 9, Aff. of Dr. Raymond Bucko, Dkt. No. 68-6, Case No. 2:99-CR-00047.

But against these passionate denunciations of the efforts of non-Native American adherents to "play Indian" must be set the equally vehement conviction of other individuals and tribes that individual belief is enough to warrant inclusion in Native American religious rituals:

> Having put our minds together, we respectfully submit that the purpose and extent of our prayers can not always be limited by the color of skin nor national origin. The important thing, we find, is intent and the strength of commitment and the history of relations with each and every individual family that our elders host in our annual Sun Dance in the Black Hills.  This is the paramount importance to us. Rather than deny or separate our peoples from the range of relatives who pray with us, we say that our prayers and our people are best served by the extension of reverence and goodwill to the Four Directions.

Elders of the Afraid of Bear/American Horse Sun Dance, Response to the Looking Horse Proclamation, Appx. 12, Aff. of Dr. Raymond Bucko, Dkt. No. 68-6, Case No. 2:99-CR-00047.

There is no single Native American response to the question whether the participation of non-Native American adherents in Native American rituals fosters or diminishes Native American religions.  Because Native American social, political, and religious structures are not hierarchical, there is variation between tribes and even among them:

> Lakota, of all of the plains tribes, would be the most democratic in the sense that different spiritual leaders will make up their minds about important spiritual issues, including whether or not to follow other Lakota leaders . . .such as Arvol Looking Horse. . . . What [Arvol Looking Horse] is saying . . . is that he does not have centralized authority to govern the choices of other spiritual leaders. . . . Also individuals will choose which spiritual leader they will follow, and there is a wide variety of opinion on who is or is not a credible leader or who does or does not do their ceremonies appropriately.  All religious leaders are not followed equally.

Testimony of Dr. Raymond Bucko, Tr. 268, 270, 285.  Although the federal government

14

historically exerted considerable pressures on various tribes toward centralization of political

structures, Dr. Bucko testified that a resurgence of interest in a return to traditional forms of

social organization would lead to increasing decentralization:

> Today on Pine Ridge you have the [Bureau of Indian Affairs] government—I'm
> sorry, the Collier Indian reorganization government from the 1930s. However,
> you also have what people refer to as the grassroots people. They will say that
> the Lakota, or really many inhabitants of Pine Ridge, really need to go back to the
> traditional form of government which is based in kinship and in familial religions.
> So there is a movement also to say we need to further decentralize this.

Testimony of Dr. Raymond Bucko, Tr. 286–87. There is no single, coherent approach even

within a particular tribe as to whether non-Native American adherents should be permitted to

participate in Native American religions and possess the eagle feathers necessary to do so fully.

The en banc majority pointed to the absence of evidence in the record on the "threshold

question of whether allowing [non-Native American adherents] to possess feathers . . . truly

threatens Native American culture. Allowing a wider variety of people to participate in Native

American religion could just as easily foster Native American culture and religion by exposing it

to a wider array of persons." *Hardman*, 297 F.3d at 1133 (emphasis in original). Additional

evidence has made this threshold question more difficult rather than less difficult to answer,

since the variety of inter- and intra-tribal beliefs and the absence of a hierarchical religious

structure that would determine doctrine makes characterization of any single unified and

somehow definitively Native American position on the distribution of feathers impossible.

It is no simple matter for the government to fulfill its trust obligations to groups animated

by differing beliefs regarding the authentic practice of their religions. Mr. Hardman and Mr.

Wilgus appear to have developed their religious beliefs and practices with the assistance of

Native Americans who perceived no political or theological difficulties in sharing their religious

beliefs and practices—and the accoutrements, including feathers, that accompany them—with non-Native American persons.  The Paiutes of Cedar City and the Hopi Tribe in Arizona who gave feathers to Mr. Wilgus and Mr. Hardman[10] would presumably feel that a permitting system that allowed them to transfer feathers to those they deemed worthy protected and promoted their culture and religious beliefs.  These tribes might even support a system of regulation that would allow non-Native American adherents to apply to the Repository directly.  Other tribes would no doubt feel their interests harmed by any alteration to the existing permitting system.  The difficulty with any alteration to the current permitting system is not only that increasing the number of persons eligible to apply would inevitably increase wait times at the Repository, but that any permitting system (including the existing one) privileges the interests of some individuals and tribes over the interests of others.  The current system favors those tribes which oppose the participation of non-Native American adherents in Native American religions.  Alterations along the lines recommended by the defendants or recognized by the en banc court will promote the interests of those tribes and individuals who wish to permit the participation of non-Native American adherents in Native American religions.  Whatever policy it chooses, the government will have furthered its compelling interest with regard to some tribes and frustrated it with regard to others.

### *Number of Non-Native American Adherents*

---

[10]It is, of course, possible that there is dissent within these tribes as to the appropriateness of giving feathers to non-Native American adherents or dispute as to whether the people who gave these feathers to these defendants were authorized by the tribe to do so.  The government's task of fostering Native American culture is a perilous one.

The differing theological and political interests of different Native American individuals and groups are not the only variable in determining how burdens on religious practice ought to be distributed. Obviously, the number of non-Native American adherents of Native American religions who would apply for permits to possess eagle feathers if permitted to do so is an important part of the discussion. In support of its contention that there are large numbers of non-Native American adherents who would seek to possess eagle feathers if allowed to do so, the government offers the extrapolations of its expert in sociology, Dr. Darren Sherkat. Dr. Sherkat's predictions are based on a combination of census data and data from the General Social Survey (G.S.S.). Until recently, neither source of data was designed to capture associations between race and religion; even now, neither is especially well adapted to provide the precise numbers required here. Prior to the 2000 Census, respondents were forced to self-identify as one race only; the 2000 Census permitted respondents to select multiple ethnic identities. But the greater flexibility for respondents in the 2000 Census is not intended to—and does not—generate the data necessary to correlate with confidence ethnic identity and denominational preference. We know, for example, that point nine percent (0.9%) of the United States population in 2000 claimed Native American as their sole ethnic identification and that another point six percent (0.6%) claimed Native American in addition to some other ethnic identification. Testimony of Dr. Darren Sherkat, Tr. 224. But we know nothing about the percentage of those self-reports that are associated with enrolled membership in a federally recognized tribe, *id.*, which is essential to a determination of how many people are currently eligible to receive feathers from the Repository. Moreover, the Census does not collect information regarding respondents' religious affiliations. *Id.* at 225.

17

Unlike the Census, the G.S.S. operates by statistical sampling and some individual interviews to create "a nationally representative survey of the American population, a representative sample of non-institutionalized English speaking populations." Testimony of Dr. Darren Sherkat, Tr. 222. Since 1998, the G.S.S. has collected data on religion, permitting a comparison of racial to religious identification. *Id*. at 226. Comparing these figures, Dr. Sherkat found that sixty-six percent of those who claimed an indigenous religion also claimed indigenous ethnicity. *Id*. at 227. On subsequent analysis, Dr. Sherkat found that thirty-three percent of those claiming indigenous religions were white. *Id*. Dr. Sherkat then extrapolated from the number of people claiming indigenous religions on the G.S.S. to the number of people in the general population (based on 2006 Census data) who would claim an indigenous religion and arrived at a total of 284,433 practitioners (of various ethnicities) of indigenous religions. *Id*. To determine how many of those practitioners of indigenous religions were enrolled members of federally recognized tribes, Dr. Sherkat used Bureau of Indian Affairs data on numbers of enrolled members and G.S.S. data on the percentage of those who identify as indigenous and who also practice indigenous religions. *Id*. at 230. Based on G.S.S. data, Dr. Sherkat concluded that one point six percent (1.6%) was a "fairly conservative estimate" of the number of people who claim Native American ethnicity and a Native American religious faith. *Id*. at 231. That figure, however, would include individuals who have some Native American ancestry but who are not—and could not be—enrolled members of federally recognized tribes. Dr. Sherkat then multiplied that number by the 1.9 million enrolled members calculated by the Bureau of Indian Affairs and arrived at the conclusion that 30,590 enrolled members of federally recognized tribes who practice Native American religions could apply for feathers from the Repository. *Id*. at 234.

Dr. Sherkat thus predicts a demand for eagle feathers substantially greater than the supply of them.  If enrolled members of federally recognized tribes applied to the Repository in the numbers Dr. Sherkat projects as being eligible and reasonably likely to apply, the Repository's resources would quickly be overwhelmed.

To drive the numbers even higher, the government suggests that increased demand could come not only from non-Native American adherents, but from practitioners of Afro-Caribbean religions as well.  According to Rafael Martinez, who has conducted research on Afro-Caribbean religions practiced in Florida, practitioners of Santeria, Palo Mayombe and other Afro-Caribbean religions require eagle parts for their religious practices.  Aff. of Rafael Martinez ¶¶ 5–6, Dkt. 68-9, Case No. 2:99-CR-00047.  According to Mr. Martinez, the number of practitioners of these religions is increasing as syncretic practices become part of a "resurgence in new age, non-traditional beliefs in the past 25 years."  *Id*. ¶ 7.  While hard numbers are difficult to ascertain "as the US Census does not capture such religious affiliation," Mr. Martinez cites studies that "conservatively estimate[]" that over 1,000,000 people in this country practice a form of Santeria.  *Id*.

To complicate predictions of demand still further, the religious beliefs and practices of many Americans have developed a certain fluidity in recent years, introducing yet another unpredictable element into the calculus.  Summarizing recent research on the tendency of many Americans toward eclectic religions, combining elements of various faiths into idiosyncratic and ever-changing personal religious practices, Dr. Bucko observed that there is evidence of "relative trends toward religious eclecticism such as Native American religions or hybrids thereof that could possibly entail the use of such feathers.  Fundamentally, it is not a static

19

situation, and all indications are that the pool of religious eclectics is trending upwards." Aff. of Dr. Raymond Bucko ¶ 7(c), Dkt. No. 68-6, Case No. 2:99-CR-00047. An application of even a fraction of the number of Native Americans Dr. Sherkat estimates are already eligible and likely to apply would overwhelm the resources of the Repository. If non-Native American adherents were permitted to possess feathers as well, and if Dr. Sherkat's projections are to be credited, the increased demand on the Repository would be substantial to the point of completely overwhelming supply. Adding practitioners of Afro-Caribbean religions without number and a growing population of religious eclectics of all sorts would only compound the catastrophe.

### *Feathers and Eagles*

The government's task in furthering Native American cultures would be delicate and complex enough even if it were the only goal the government were pursuing. It is not. That interest, whatever its contours, must also be balanced against the government's concern for maintaining healthy eagle populations. This half of the balance has changed significantly, even in the time between the lengthy evidentiary hearings conducted by this Court on remand.

In 2004, the Repository received 1,822 new requests for eagles and eagle parts: 349 requests for bald eagles and 842 for golden eagles. Gov. Exh. 1 to Testimony of Beverly Golec, Evidentiary Hearing Transcript, Vol. I, 84–102. In the same period the Repository received 1,647 eagles: 1,142 bald eagles and 505 golden eagles. *Id*. The Repository does not match the eagles received in a particular year to the new recipients of the same year, since there is always a substantial backlog of applicants from previous years. Nevertheless, the evidence provided by Ms. Golec, Ms. Downey, and Ms. Atencio make it abundantly clear that supply is far from

20

timely meeting demand at the Repository.  Bernadette Atencio, who manages the Repository, testified that the waiting period to receive a whole bald eagle is currently approximately two and one-half years.  Testimony of Bernadette Atencio, Tr. 180.  The wait time for golden eagles is even longer: for an adult golden eagle the wait is three and one-half to four years, and for an immature golden eagle the wait is nearer to four to four and one-half years.  *Id.*  Orders for loose feathers can be filled more quickly: an order for ten matched higher-quality loose feathers is approximately six months, and the wait for twenty miscellaneous lower-quality feathers is only ninety days.  *Id.* at 179–80.  Based on the evidence it is clear the Repository system is already vulnerable to any significant increase in demand.

The protections of the Bald and Golden Eagle Protection Act and the Migratory Bird Treaty Act were established in response to dramatic declines in eagle populations in the first three-quarters of the twentieth century.  Dr. James Fraser, the government's bald eagle expert, dated the decline in bald eagle populations to the European settlement of North America and indicated that this trend was reversed only in the mid-1970s by efforts to protect eagle habitat, eliminate particularly damaging pesticides, and enforce bans on taking eagles.  Aff. of Dr. James Fraser ¶¶ 4, 6, Dkt. No 68-3, Case No. 2:99-CR-00047.  Several features of eagle biology have made eagle populations slow to rebound from their earlier losses.  Bald eagles do not breed until they are six years old or older, and produce on average only two eggs per pair per year, of which only one will ultimately leave the nest, or fledge.  Aff. of Jody Gustitus Millar ¶ 10, Dkt. No. 68-8, Case No. 2:99-CR- 47.  Of those birds successfully fledged, only 50% may survive to maturity.  *Id.*  Both the male and female eagle participate in raising young, so the loss of one member of a breeding pair makes the survival of any chicks unlikely.  Aff. of Karen Steenhof ¶

3, Dkt. No. 68-8, Case No. 2:99-CR-47.  All of these factors combine to make bald eagle populations very sensitive to reductions in adult survival.[11]  Fraser Aff. ¶ 4; Millar Aff. ¶ 12. Species which reproduce early and abundantly will be unaffected by the loss of adult birds relative to bald eagles: "because of their natural history, specifically long life and low reproductive rate, [bald eagles] are sensitive to induced forms of mortality, be it from shooting or by trapping or by running into power lines that were not here in prehistoric times.  That will always be the case.  That is a part of their natural history."  Testimony of Dr. James Fraser, Evidentiary Hearing Transcript, Vol. II, 295.  An increased take of adult bald eagles will thus have a disproportionate effect on populations of eagles overall:

> The loss of an adult breeding pair may be equivalent to the loss of 10–15 fledgling eagles due to the long-term loss of reproductive capability.  On an annual basis, that would be the entire reproductive capacity of 10 to 15 pairs of bald eagles or all the reproduction of bald eagles for the State of Kansas for a year.  Certainly, the population can withstand some individual mortality without depressing population numbers.  But on a long-term or widespread basis, unregulated take of mature bald eagles can depress, and potentially endanger the population.

Millar Aff. ¶ 14.

The uncontradicted evidence in the record is that a relatively small increase in the mortality of adult eagles, from whatever cause, could quickly erase the gains achieved by recent conservation measures.  But the evidence as to what increase in adult mortality would tip the balance is, of necessity, vague: "right now the populations are still increasing and an increase in take would reduce the rate of recovery, and at some point the population will stabilize with

---

[11]Golden eagle populations are similarly sensitive to adult mortality as they, too, are long-lived birds producing small numbers of offspring.  Testimony of Kevin Ellis, Evidentiary Hearing Transcript, Vol. I, 136–37.

respect to the habitat, and that increase in take would in all likelihood take the population into decline." Testimony of Dr. James Fraser, Evidentiary Hearing Transcript, Vol. II, 296.

Despite these formidable difficulties, conservation efforts have led to a recovery in eagle populations so pronounced that on June 28, 2007, then Secretary of the Interior Dirk Kempthorne announced the removal of the bald eagle from the list of threatened species protected under the Endangered Species Act, 16 U.S.C. § 1531 *et seq*. The Secretary described the bald eagle's recovery in glowing terms: "After nearly disappearing from most of the United States decades ago, the bald eagle is now flourishing across the nation and no longer needs the protection of the Endangered Species Act." June 28, 2007 United States Fish and Wildlife Service News Release,

http://www.fws.gov/news/NewsReleases/showNews.cfm?newsId=72A15E1E-F69D-06E2-5C7B 052DB01FD002, accessed July 25, 2007. The bald eagle has "soar[ed] off the endangered species list," so that even without the protections of the Endangered Species Act the Secretary remains "confident in the future security of the American Bald Eagle." *Id*.


***Supply and Quality of Feathers***

The recovery of eagle populations, while sufficient to justify delisting, does not ease the constraints under which the Repository operates; more eagles in the wild will not immediately translate into more feathers available for distribution at the Repository. In the ordinary course, more wild eagles should lead to the availability of more eagle bits and pieces for distribution. *See Hardman*, 297 F.3d at 1133 ("The government gives no consideration to any offsetting increase in available parts from any recovery of bald and golden eagle population.") But that

assumption depends on an increased number of living eagles becoming, in the fulness of time, an increased number of dead eagles whose carcases are likely to be found, and found in useable condition.  But the likelihood that an eagle carcase will be found depends on the cause of mortality; and efforts to ameliorate obvious causes of eagle mortality have led to some decline in the types of death most likely to lead to a recoverable carcass.  Kevin Ellis, a special agent for the Fish and Wildlife Service specializing in enforcement of migratory bird laws, testified that "probably 98 percent of the birds that are turned in or more," are those readily available to the public.  Testimony of Kevin Ellis, Evidentiary Hearing Transcript, Vol. I, 142, 125.  Those generally available to the public are those killed in places likely to be noticed by a person, that is, "hit by a car [or] found under a power pole."  *Id*.  But the more easily recognized causes of eagle mortality are the very causes fish and game officers have made some progress in diminishing:

> over the last 20 years the number of eagles electrocuted went way up.  The Fish and Wildlife Service has recognized that and the states have recognized that.  We have instituted measures through the power companies to alleviate a lot of that mortality.
>
> So if the population numbers increase, you would expect to see more bald eagles in the numbers that I collect.  However, we have been offsetting some of that mortality by correcting the problem.  We strictly enforce poisoning laws. The poisoning of eagles, primarily for livestock control, over the last 20 or 30 years was devastating to populations in certain areas.  We have enforced those laws and I think poisoning is on the decline.

Testimony of Kevin Ellis, Evidentiary Hearing Transcript, Vol. I, 124–25; *see also* Testimony of Dr. James Fraser, Evidentiary Hearing Transcript, Vol. II, 303.

The staff of the Repository has also made efforts to ensure that those who find eagle carcasses know where to send them, preparing training materials and giving presentations to federal and state fish and wildlife staff.  Aff. of Bernadette Atencio, June 18, 2003, ¶ 12, Dkt.

No. 68-9, Case No. 2:99-CR-47.  Repository staff have also made efforts at "outreach" to the

Native American community and the public in an effort to increase the number of eagles

recovered and sent to the Repository.  *Id*.  The Repository's outreach program has taught people

not only where to send eagles they have found but also where to apply for eagle feathers if they

are entitled to them.  And the Repository's program has been successful on both fronts, so that

the increased number of eagles sent to the Repository has been offset by an increase in

applications.  *Id*. ¶ 13.  *See also* Testimony of Bernadette Atencio, Tr. 184 ("The increase in the

eagles that we're getting kind of correlates equally to the number of applications that are

increasing every year.").

The record shows that there is no "significant untapped source of birds" not already being

sent to the Repository.  Testimony of Kevin Ellis, Tr. 129.  If eagle populations continue to

increase at the rate they are currently, there will presumably come a time when there are more

feathers available and wait lists at the Repository will be correspondingly shorter (assuming

there are no offsetting increase in numbers of applications), but the undisputed evidence at this

point is that that time has not yet arrived.

Moreover, not all the eagles sent to the Repository are in useable condition:  "Many times

only loose feathers are salvageable from badly decomposed or damaged carcasses."  Aff. of

Bernadette Atencio, June 18, 2003, ¶ 6, Dkt. No. 68-9, Case No. 2:99-CR-00047.  This

admission is echoed in the frustration of some recipients of eagles from the Repository.  *See*

*United States v. Oliver*, 2000 WL 34030990, * 4 (N.D. Iowa 2000) (unpublished) ("The

defendant testified that he did not always get what he requested from the Wildlife repository, and

that he was not always satisfied with the quality of the eagles he received, describing one of

25

them as 'rotted,' 'eaten' or 'frayed.'").  The fact that eagle populations are recovering has not

thus far meant that more eagles are dying in manners and locations that add their feathers to the

Repository's supplies.

Even when an eagle feather would appear to a biologist to be in good condition, there

may be theological reasons peculiar to a tribal sect that make the feather unacceptable for

religious uses.  Mr. Ellis testified that any effort to mark feathers so as to be able to identify them

after distribution could also make them unsuitable for distribution for religious reasons:

> I think also you have to consider that there will be an impact to the people that
> obtain these feathers, and that may influence whether they want the feathers if
> they have been marked or changed in some way.  There are significant amount of
> Native Americans that have certain beliefs about the condition of the feathers and
> a number of other issues.

Testimony of Kevin Ellis, Tr. 139.  *See also United States v. Friday*, 2006 WL 3592952, *1 (D.

Wyo. Oct. 13, 2006), *rev'd on other grounds*, 525 F.3d 938 (10th Cir. 2008) ("Defendant and

[Northern Arapaho Tribe] assert that 'clean' eagles are required for their ceremonies; eagles that

have died as a result of electrocution, vehicle collision, unlawful shooting or trapping, poisoning

or from natural causes are unacceptable for ceremonial sacrifice.  The Tribe contends that the

actual hunting and taking of an eagle is an act of religious belief and is itself entitled to

protection under the free exercise clause."); Aff. of Dr. Raymond Bucko ¶ 4, Dkt. 68-6, Case No.

2:99-cr-00047 ("The importance of the feathers is demonstrated not only in the wide variety of

their uses but also in how they are handled.  For example, in Lakota tradition, if a feather falls to

the ground, only certain people such as veterans may retrieve it.  When not in use they are

carefully wrapped and stored in a proper container.  Tribes have strong philosophical opinions as

to who should possess feathers and when, how, where and by whom they should be used.").

As Dr. Fraser pointed out, more living eagles means more feathers only if you can find all the dead eagles—and North America is a big place.  Testimony of Dr. James Fraser, Evidentiary Hearing Transcript, Vol. II, 300.  While more nesting pairs undoubtedly means more feathers on more birds alive and dead, the uncontradicted evidence in the record is that more nesting pairs does not—in the short term at least—mean more feathers available for distribution through the Repository and shorter wait times.  Thus the fact that policies promoting one of the government's compelling interests—eagle protection—have met with some success does not mean that the strains on the system intended to further the government's other compelling interest have eased.

### Limitations on Enforcement Resources

The government argues that dropping the ban on non-Native American possession of eagle feathers will make enforcement of any restrictions on possession well-nigh impossible.  At present, Fish and Wildlife Service agents can be fairly certain that a person who is not Native American who possesses eagle feathers does so illegally.[12]  The distinction, for law-enforcement purposes, between possession by Native Americans and non-Native Americans is embodied in the Morton Policy, a policy promulgated by the Secretary of the Interior in 1975 directing agents not to investigate possession of migratory bird parts by Native Americans.  Morton Policy, Attch. 1., Aff. of Kevin R. Garlick, Dkt. No. 79-2, Case No. 2:99-CR-00047.  Without a simple

---

[12]This easy distinction can be disrupted, though, by a claim that the feathers possessed are pre-Act feathers.  It is legal to possess bald eagle feathers acquired prior to the passage of the Bald Eagle Protection Act in 1940 and golden eagle feathers acquired prior to inclusion of golden eagles in the protections of the Bald and Golden Eagle Act in 1962.

method of detecting—or, at least, creating a strong suspicion of—illegal possession, Fish and

Wildlife Service agents predict that it would be virtually impossible to investigate anyone's

possession of eagle feathers.  *See*, *e.g.*, Aff. of Lucinda Schroeder ¶¶ 8–14, Dkt. No. 68-2, Case

No. 2:99-CR-00047.  In the ensuing law enforcement vacuum, the government predicts, a

flourishing black market trade in eagle feathers will spring up, and enterprising suppliers will

begin to kill eagles to satisfy the growing demand.

Even with the current bright-line rules determining whose possession will be

investigated, the evidence suggests that the Fish and Wildlife Service already has some difficulty

monitoring feathers distributed through the Repository:

> I believe that eagle feathers and parts enter the black market after the birds are
> lawfully obtained from the USFWS Eagle Repository under permits issued to
> Native Americans.  On at least three occasions during undercover operations,
> myself or other agents have been told about, or purchased eagle parts, which
> subjects indicated were obtained in this manner.  Further, I have learned from
> Native American informants in the past that this practice is not uncommon as the
> Government does not have the manpower, the means, or the political fortitude to
> attempt to have it's [sic] agents verify any of the applications made for eagle
> permits, or the accompanying claims as to why a person is requesting a [sic] eagle
> or eagle feathers.

Affidavit of Kevin Ellis ¶ 6b, Dkt. No. 68-5, Case No. 2:99-CR-47.  The distinction between

Native American and non-Native American possession appears to be a far from perfect law

enforcement tool, since it excludes from investigation an entire category of persons who might

request, possess, and transfer feathers for commercial rather than religious purposes.


*Analysis:  Least Restrictive Means*

Whether the government has employed the least restrictive means to further its

compelling interests is a question of law.  *United States v. Friday*, 525 F.3d 938, 949-50 (10th

Cir. 2008).  The state of the evidence, then, with regard to the interests the government must

properly set in equipoise is this.  Eagle populations have recovered to so great an extent that the

government has delisted them from the Endangered Species Act.  What effect the delisting will

have on the recovery of eagle populations will become apparent only with the passage of time.

The number of enrolled members of federally registered tribes eligible to receive feathers from

the Repository might already be sufficient to overwhelm current (and reasonably foreseeable)

resources if only they applied.  Moreover, there might be thousands of non-Native American

adherents of Native American religions whose religious practices are substantially burdened by

the existing permitting scheme.  In addition, there may be a million practitioners of Afro-

Caribbean religions in this country who require eagle feathers to perform their religious rituals.

Adding a significant number of applications to the Repository would lengthen wait times

exponentially, thereby probably defeating both the government's compelling interest in

protecting Native American religions by giving Native American persons some access to the raw

materials necessary for their traditional worship, and in protecting eagles from an insatiable

demand likely to lead to poaching and a burgeoning black market.  It is the government's

formidable task, in light of all these facts, to set its compelling interests in equipoise so as to

protect Native American culture and eagles in the manner least restrictive of the RFRA right to

free exercise of the defendants, and the Court's task to assess whether the government has done

so.  *See United States v. Hardman*, 297 F.3d 1116, 1135 (10th Cir. 2002) (en banc).  Neither the

government's nor the Court's task is made easier by the fact that the point at which two interests

balance will shift when the weight of either side—or both—changes.

It is much to be doubted whether a court is the ideal venue in which to address an ever-

shifting balance among competing interests.  In the first place, case-by-case adjudication is a poor manner in which to allocate a scarce resource, particularly when neither the supply of nor the demand for that resource is stable or readily quantified.  Moreover, case-by-case adjudication places only the parties to the lawsuit before the court, who are very far from being the only parties who would wish to claim a share in the resource being allocated.  Geographic variations in supply and demand for eagle feathers also make case-by-case adjudication a dubious means of arriving at a single national result.  It is all very well that eagle populations are thriving in Wisconsin and Minnesota, but the southwestern United States is another matter: the best current estimate is that there are nine nesting pairs of eagles in Utah, three in Nevada, four in New Mexico.  It could be argued—and with some justice—that Congress and administrative agencies with expertise in monitoring eagle populations and applications to the Repository are much better suited to determine how to allocate the limited resource of eagle feathers.  Nevertheless, the very task RFRA imposes on the courts is that of making refinements on general statutory schemes to accommodate the religious practices of the parties who come before them: "Whatever our justifiably low opinion of our own competence, we are not free to decline to enforce the statute, which necessarily puts courts in the position of crafting religious exemptions to federal laws that burden religious exercise without sufficient justification."  *O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 1020 (10th Cir. 2004) (en banc) (McConnell, J. concurring), *aff'd sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418 (2006).

As the government has recently demonstrated by delisting the bald eagle, at least one side of the balance has changed.  Delisting is the government's own acknowledgment that eagle

populations require fewer government protections in order to continue to recover, and that shift

alters the proper balance point:

> The bald eagle would remain our national symbol whether there were 100 eagles or 100,000 eagles. The government's interest in preserving the species remains compelling in either situation. What might change depending on the number of birds existing is the scope of a program that we would accept as being narrowly tailored as the least restrictive means of achieving its interest.

*United States v. Hardman*, 297 F.3d 1116, 1128 (10th Cir. 2002).  In other words, the delisting

of the bald eagle makes it more difficult to show that measures impinging on religious practices

which are justified—at least in part—as essential to the protection of eagles are the least

restrictive means of achieving the goal of protecting eagles.[13]

---

[13]Other Circuit Courts of Appeal have treated possible delisting as relevant to whether the government retains a compelling interest in the preservation of bald eagles:

> The delisting <u>proposal</u> concededly provides some support for [Defendant's] argument that the eagle-protection interest is weaker than [formerly]. And changed circumstances may, in theory, transform a compelling interest into a less than compelling one. . . .  Nonetheless, the government cannot reasonably be expected to relitigate the issue with every increase in the eagle population.  Such an approach would plague our circuit law with inconsistency and uncertainty. A party claiming that time has transformed a once-valid application of a statute into an invalid one must adduce evidence sufficient to convince us that a substantial change in relevant circumstances has occurred. The <u>proposal</u> to delist does not meet this standard.

*United States v. Antoine*, 318 F.3d 919, 921–22 (9th Cir. 2003) (emphasis added); *see also United States v. Oliver*, 255 F.3d 588, 589 (8th Cir. 2001) (dismissing defendant's argument that the proposed delisting rendered the government's interest less than compelling because the "bald eagle has not been removed from the endangered species lists as of this date, therefore, sufficient evidence demonstrating the removal of the compelling governmental interest has not been presented").  Whether delisting is relevant to the compelling nature of the government's interest or to the least restrictive means analysis, delisting remains an event of significance, an event requiring the government to demonstrate why changed circumstances should not alter the status quo of the government's efforts to protect eagles.

Since deciding *Antoine*, another Ninth Circuit panel has determined that the government's interest in eagle protection remains compelling despite the fact that the bald eagle has now been delisted.  *See United States v. Vasquez-Ramos*, 531 F.3d 987 (9th Cir. 2008).  This determination is not relevant to the analysis in this case for two reasons.  To begin with, the

But the government argues that its other compelling interest has changed as well, and changed in such a way as to jeopardize both of its compelling interests if eligibility for permits were expanded.  The government seeks to minimize the significance of delisting by arguing that the increase in eagle populations has been more than offset by the increase in numbers of three groups of people who would wish access—or greater access—to eagle feathers for religious purposes: enrolled members of federally recognized tribes who already are eligible to apply for feathers but have to wait for them, non-Native American adherents to Native American religions, and practitioners of Afro-Caribbean religions.  If all these persons—in the numbers the government's experts claimed—were in a position to demand access to eagle feathers, Native Americans' access to feathers would indeed be disastrously diminished.  But the government's evidence as to the numbers of the first two groups is based largely on expert testimony the Court finds unpersuasive and the claims of the third group, for reasons discussed below, form no part of this lawsuit.

---

Tenth Circuit Court of Appeals has already held that the government's interest in eagle protection remains compelling whether eagle populations are threatened or not.  *See Hardman*, 297 F.3d at 1128.  Moreover, *Vasquez-Ramos* applies a different legal standard than that at issue here, and does so in light of a record with significant factual and legal differences.  Bound by *Antoine*, as this Court is not, the *Vasquez-Ramos* panel could only arrive at a different result if there "has been a substantial change in relevant circumstances or a subsequent en banc or Supreme Court decision that is clearly irreconcilable compelling with our prior holding."  *Vasquez-Ramos*, 531 F.3d at 991.  The panel's conclusion that the legal standard for diverging from binding Ninth Circuit precedent was not met on the facts of that case provides no insight into the question posed in this one.  The defendants in *Vasquez-Ramos* also limited their argument to whether the government's interest in eagle protection remained compelling after delisting, whereas this Court's inquiry is whether the government employs the least restrictive means in pursuing that interest.  Finally, the factual record in *Vasquez-Ramos* provided evidence only of the burden increased demands on the repository would place on Native-American practitioners, and is silent with regard to the diverse opinions held among the tribes regarding the means by which their religious practices are best advanced.  *See Vasquez-Ramos*, 531 F.3d at 992.

First, Dr. Sherkat projects very large numbers of Native American and non-Native American practitioners of Native American religions from very small sample sizes. As a general rule, the smaller the sample size, the less reliable the projections based on it. Moreover, for want of better sources, Dr. Sherkat was forced to rely exclusively on sources of data that were not designed to capture the information he was seeking. The problems implicit in small sample sizes were thus compounded by the difficulties of inferring answers to questions never asked. These difficulties were not of Dr. Sherkat's making, but they are difficulties that must undermine the Court's confidence in his conclusions. And the Court is not alone in these doubts; another of the government's witnesses, Dr. Raymond Bucko, after conducting "extensive research" in an effort to determine how many non-Native American adherents there are concluded that "specific hard numbers do not exist" because "no one has studied this question using a reliable statistical methodology." Aff. of Dr. Raymond Bucko ¶ 5, Dkt. No. 68-6, Case No. 2:99-CR-00047. As Dr. Bucko observes, "hard numbers are elusive at best." *Id*. ¶ 11.

But perhaps the best reason to distrust Dr. Sherkat's projected numbers is the numbers themselves. Dr. Sherkat projected that there are 30,590 enrolled members of federally recognized tribes who practice Native American religions. Testimony of Dr. Darren Sherkat, Evidentiary Hearing Transcript at 234. That is, among all the enrolled members of federally recognized tribes already eligible to request feathers from the Repository, there are 30,590 people whose religious affiliation makes them likely to do so. And yet they do not. The Repository received only 1,822 new requests for eagles and eagle parts in 2004; actual demand is significantly lower than Dr.

33

Sherkat's calculations would suggest.[14]  There are many possible partial explanations for these discrepancies.  It could be that anticipated delays keep some eligible persons from applying.  An unwillingness to use Repository feathers could lead others to poach or obtain feathers on the black market.  And it is likely that Native American practitioners of Native American religions sometimes do not practice their faiths with that punctilious attention to detail that their denominations may, in theory, require.  Not every self-described Catholic turns up for mass each and every Sunday, and some self-described Native American adherents to Native American religions may have no real need for eagle feathers at all.  And perhaps the limitations of the data from which Dr. Sherkat worked makes his other predictions regarding the number of non-Native American practitioners of Native-American religions likely to require feathers as unreliable a predictor of demand for feathers as his predictions regarding the number of Native American practitioners likely to apply for feathers.

The second reason the Court is unwilling to put much confidence in Dr. Sherkat's estimates is attributable to Dr. Sherkat himself: Dr. Sherkat's remarkable misreading of an opinion in a 1997 District of New Mexico case holding that the then-current D.S. Fish and Wildlife Service form, which required Native American applicants to state the name of the religious ceremony for which they were requesting feathers violated the least restrictive means requirement of RFRA.  *United States v. Gonzales*, 957 F.Supp. 1225 (D.N.M. 1997).  Based on

---

[14]Because there is a waiting period of several years for whole eagles, the number of persons with pending applications at any given time is higher than the number of new applications, but the number of pending applications is well under two thousand, and thus does nothing to explain the discrepancy between the number of applicants Dr. Sherkat projects and the actual number of applicants.  *See* Aff. of Linda Downey at 21.

the holding in *Gonzales*, the question regarding the name of the particular ceremony was dropped

from the application.  Paragraph fifteen of Dr. Sherkat's affidavit conveys Dr. Sherkat's opinion

that the case was wrongly decided.  But it was not just the outcome of *Gonzales* that Dr. Sherkat

found objectionable; Dr. Sherkat objected—at considerable length and with considerable

asperity—to the New Mexico judge's reasoning that he "need only look at Mr. Gonzales" in

reaching his decision.  Dr. Sherkat inferred from this remark that the judge in *Gonzales* based his

decision on some species of racial prejudice:

> I have read the decision rendered in [*Gonzales*] and I find its determinations at
> odds with sociological reasoning.  The Federal Government used to require the
> approval of a religious elite (medicine man, tribal chief, or the like) and a
> statement of the ceremony for which an eagle was needed before eagle parts could
> be obtained.  Apparently, these simple criteria were done away with under the
> argument that religion can be determined by a more obvious and less intrusive
> manner.  Indeed, the judge stated in his decision, "I need only look at Mr.
> Gonzales."  As a sociologist, I find such a statement professionally irresponsible
> and the result of ignorance and prejudice on the part of the judge.  Indeed, the
> judge in *Gonzales* invokes an almost textbook definition of prejudice in his closing
> statements.  If someone was to use this "just look at him" reasoning in another
> manner, and against another group, there would be a firestorm of controversy.  No
> judge or government administrator can determine religiosity by a person's skin
> color or perceived ethnicity.  Personally I cannot imagine a scientific justification
> for rejecting the previous criteria for eligibility. . . .

Aff. of Dr. Darren Sherkat ¶ 15, Dkt. 68-8, Case No. 2:99-CR-00047.

In the context of the opinion in *Gonzales*, however, it is singularly clear that the district

judge's conclusion that he "need only look at Mr. Gonzales" represented a rejection of the

government's argument that Ninth Circuit precedent required a court conducting a least restrictive

means analysis to "look at the impact on the government's compelling interest that would follow

from excepting all Native Americans from the application/permit process."  *Gonzales*, 957 F.

Supp. at 1229.  Despite this argument, the district court concluded that the Ninth Circuit case

introduced no such requirement and that the court need only consider the impact of exempting the defendant before the court, that is, Mr. Gonzales.

The urge to essay authoritative explanation of matters understood but imperfectly is perhaps universal, but succumbing to the urge under oath and when purporting to speak as an expert is not.  Dr. Sherkat's overconfidence, coupled with his failure to understand the extent of his expertise, is particularly damaging when the reliability of his other testimony regarding numbers of likely applicants for feathers rests so heavily on his professional judgment.  In other words, Dr. Sherkat has not just performed mechanical calculations on data whose relevance and accuracy have been verified by others.  Dr. Sherkat has rather made extrapolations from various sources he admits are not especially well adapted to supply answers to the questions he is asking.  Dr. Sherkat's remarkable failure in professional judgment makes the Court unable to rely on his judgment in making those extrapolations, leaving the Court a result with very little credible evidence as to the numbers of both types of adherents to Native American religions.  And such evidence is absolutely necessary if the government is to carry its burden of showing that its restrictions are the least restrictive means of pursuing its legitimate goals.

The government has been on notice that the Court had found Dr. Sherkat to be a less than credible expert witness:[15]

---

[15]Counsel for the government apologized for paragraph 15 of Dr. Sherkat's affidavit and for neglecting to supervise its expert witnesses more closely, and expressed an intention of filing an amended affidavit redacting the offending paragraph.  The amended affidavit which deletes paragraph 15, was filed as an attachment to the government's post-hearing brief.  The redacted version is an improvement: the government is no longer offering as evidence a wholly unsupported accusation of racial prejudice directed at a United States District Judge.  But redacting the paragraph does not have the effect of removing its only relevant effect: casting doubt on Dr. Sherkat's professional judgment.

The sentence [from J. Parker's opinion, discussed in paragraph 15 of Dr. Sherkat's affidavit] actually makes everything even worse. In context that sentence in no way, in no way can be read the way the witness read it. [Judge Parker] is very clearly saying that I only need to look at Mr. Gonzales' case. It does make me wonder, and you can tell your witness this, if he wants to submit some kind of a new affidavit, it makes me wonder about the entirety of his testimony, frankly, that he can so completely misread a judge's opinion and attack him in such a cruel way, actually, when you read his paragraph 15. I invite all of you to read Judge Parker's opinion and read the witness's attack on it and tell me if I am missing something.

Tr. at 277. It is the government's burden to show that its preferred solution is the least restrictive one possible, and this burden cannot be carried by predicting dire results based solely on the highly dubious speculations of an expert whose blunders cast doubt on his entire testimony.

But it is not just the Native American and non-Native American practitioners of Native American religions whose numbers may be increasing. The government has also offered evidence that there are large numbers of practitioners of Afro-Caribbean religions who also have need of eagle parts in order to perform religious ceremonies. Mr. Rafael Martinez testified that there may be a million practitioners of Afro-Caribbean religions in this country who require eagle parts for their religious ceremonies. Aff. of Rafael Martinez ¶ 7, Dkt. No. 68-9, Case No. 2:99-CR-00047. The government implies that opening the permitting process to non-Native American adherents such as Mr. Hardman and Mr. Wilgus will result in an insatiable religious need for eagle feathers: after us, the deluge. But this implication is at odds with the manner in which the en banc court framed the legal issue on remand: central to the disposition of this case is the problem that an adherent who is not a member of a federally recognized tribe cannot apply for feathers from the Repository when an "identically situated" person may apply if a member of a federally recognized tribe. *Hardman*, 297 F.3d at 1135. But for tribal membership, Mr. Hardman and Mr. Wilgus are identically situated to members of enrolled tribes who can apply for feathers:

two groups practicing exactly the same religion obtain or are denied access to the required raw

materials for their religious practice on the basis of tribal membership alone.  It is the distinction

between those who are and are not permitted to practice the very same religion that is before the

Court at present.  Neither the Bald and Golden Eagle Protection Act nor the Migratory Bird

Treaty Act authorize anyone—including enrolled members of federally recognized tribes—to

possess eagle feathers for Afro-Caribbean religious purposes.  *See* 50 C.F.R. 22.22(a) & (a)(4)

("How do I apply if I want a permit for Indian religious purposes?"; the applicant must provide

the "name of tribal religious ceremony(ies) for which required.")  Practitioners of Afro-Caribbean

religions are identically situated to neither of the parties to this lawsuit and for that reason alone

are not relevant to the present inquiry.

There is another reason to distinguish between non-Native American adherents who

practice Native American religions and those who practice Afro-Caribbean religions.  As this

Court has had occasion to observe, any government policy regarding distribution of eagle feathers

to non-Native American adherents will privilege one group of Native Americans over another,

since Native American opinions differ as to the proper role of non-Native American adherents.

Expanding the permitting scheme to include non-Native American adherents will privilege the

theology and politics of those individuals and tribes who favor expanding their religious traditions

beyond tribal boundaries.  Retaining the existing permitting scheme privileges those individuals

and tribes opposed to non-Native American participation in Native American religious rituals.

But either of these alternatives advances the interests of some Native American persons and

groups.  Expanding the right to possess eagle feathers to the innumerable practitioners of other

religious traditions burdens all Native American adherents with increased wait times without any

corresponding benefit of increasing the number of non-Native American adherents to Native American religions.

The more convincing the government's evidence that there are very large numbers of persons who practice Afro-Caribbean religions and who require access to eagle feathers to practice their religion, the more the situation of these worshipers becomes radically different from that of the defendants currently before this Court.  Numbers matter in RFRA challenges.  That is, what divergence from a government policy protecting a compelling interest is possible without disastrous effects on that policy varies with the size of the divergence required.  *See O Centro*, 389 F.3d at 1020 ( McConnell, J., concurring) (contrasting the pre- and post-RFRA routine rejection of requests for religious exemptions to permit continuous religious use of a drug in widespread illegal use—marijuana—and the successful claim for an exemption for the circumscribed use of a drug not commonly diverted to illegal uses).

Unquestionably uncertainties remain as to how many non-Native American adherents there are and how many there will be in the future.  But by delisting the bald eagle the government has recently demonstrated that uncertainties need not preclude taking action that may affect eagles.  Delisting will affect a number of variables that will in turn affect eagle protection.  For example, Dr. Fraser indicated that an aspect of eagle protection in which "we could do a much better job would be in habitat protection.  We  are not doing a great job there."  Testimony of Dr. James Fraser, Evidentiary Hearing Transcript, Vol. II, 302.  The problem of inadequate habitat protection can only be exacerbated, if to a degree as yet unknown, now that eagles have lost the habitat protections of the Endangered Species Act.  The growth in human populations in the western United States will no doubt also impinge on the populations of eagles there.  Urban

sprawl in the west will have predictable effects on eagle habitats; and more humans in the areas where there are eagles will inevitably result in some interactions less predictable; two of a set of golden eagle triplets were shot and killed in their nest in Iron County, Utah, in June 2007. Nathan C. Gonzalez, Two Golden Eagles Found Killed in Iron County Nest, Salt Lake Tribune, June 16, 2007.  And practices as well as populations are changing in ways that could have substantial effects on eagle populations.  Eagle predation on livestock can create significant economic hardship for owners, and the intersection of increased eagle populations and increasingly popular free-range farming techniques will increase livestock losses to eagles.  No regulatory framework could or should take account of variables as wildly divergent and unpredictable as these; the point is rather that the government, despite the manifest and manifold uncertainties implicit in changing patterns of human behavior and demography, is sufficiently confident in the recovery of eagle populations to deprive bald eagles of the protections of the Endangered Species Act.

But in order to reject the current permitting scheme, whatever its faults, there must be less restrictive alternatives available to the government that will still further the its two compelling interests.  Two alternative schemes have been discussed by the parties: allowing enrolled members of federally recognized tribes to give their feathers to whomever they like, and allowing non-Native American adherents to apply directly to the Repository.  For reasons both practical and theoretical, the first of these alternatives is unworkable.  Tethering the free exercise rights of non-Native American adherents to the vagaries of tribal—or even individual—willingness to distribute feathers to non-Native American adherents would leave in place a substantial, government-created hurdle in the way of non-Native American adherents to possessing the raw

40

materials requisite to their religious practice.  In other words, Mr. Wilgus's proposed solution would mean that the federal government has created only the possibility of free exercise; if an individual adherent did not happen to encounter an individual both authorized and willing to distribute feathers to him, the full force of the government's prohibition would remain in effect and prevent him from practicing his religion.

As a practical matter, Mr. Wilgus's solution would also create well-nigh insuperable obstacles to enforcement of any restrictions on possession of eagle feathers.  When the Repository distributes an eagle feather, it also issues a permit that documents the distribution, a system that makes it a relatively simple matter (at least in theory) to verify that a particular person possesses a feather lawfully.  In order to preserve the ability to determine whether a feather has been lawfully transferred, Mr. Wilgus's system would require each tribal leader who wished to transfer feathers to create and maintain records of each and every transfer.  Mr. Wilgus's proposal would require the government either to impose a costly record-keeping system on any tribal religious authority who wished to distribute feathers to non-Native American adherents or to abandon attempts at enforcement of any limitation on the possession of eagle feathers.

The second alternative, however, is subject to neither of these infirmities.  It would require no great diversion of resources for a Fish and Game investigator to ask a non-Native American person with an eagle feather to produce a permit.  Moreover, the fact that anyone may lawfully possess a pre-1940 bald eagle feather or a pre-1962 golden eagle feather already commits the Fish and Wildlife Service to a certain amount of actual investigation.  Altering the permitting scheme to allow non-Native American adherents to apply does nothing to alter this scenario.  If an investigator sees a non-Native American person with an eagle feather, that investigator would,

under the new scheme, ask the adherent to produce a permit.  If the adherent could not produce a permit, the investigator could check the veracity of a claim by contacting the Repository and asking if it has a record of the distribution.  If the adherent cannot produce a permit and no record exists of the grant of a permit to that person, the investigator is faced with precisely the same scenario as confronts him now: if the adherent claims that his feathers are pre-Act feathers, the investigator must investigate that claim.  It is difficult to see that asking one additional question regarding a permit adds much to the burdens of the Fish and Wildlife Service or makes enforcement significantly more difficult than it is now.

But the government has asserted not only that their enforcement difficulties will be exacerbated, but that a thriving black market will spring up, providing incentives for the illegal take of eagles to supply the market.  But in support of this proposition the government has offered only the suspicions of several Fish and Wildlife employees.  These suspicions appear to be just that: suspicions based on the employees' perceptions of how black markets function.  It is not clear, however, that increasing the number of people who may lawfully possess feathers will lead to an increase in the profitability of supplying feathers illegally.  It seems at least as likely that those who now can only obtain feathers illegally will be content to wait their turn when they have the opportunity to obtain them from the Repository.  And since those who acquire feathers from the Repository will be able to document that fact with a permit, the government's concern that a thriving black market will spring up in the enforcement vacuum seems overstated.  Allowing non-Native American adherents to apply to the Repository directly removes the government-created burden on non-Native American adherents' exercise of religion and creates the records that make enforcement of limitations on possession of feathers possible.

It may be that allowing non-Native American adherents to apply to the Repository will, when put into practice, undermine rather than advance one or both the government's compelling interests. It may be that the number of non-Native American adherents will be so large, or grow so rapidly, as to overwhelm the resources available. Lacking the habitat protection provisions of the Endangered Species Act, eagle populations may plummet once again. Should any of those contingencies one day materialize, the government will presumably be able to do what it has not done here: produce evidence that either the protection of eagles or the protection of Native American religions requires a more stringent limitation on the numbers of people who can possess eagle feathers for religious purposes. The government would no doubt maintain that there are risks to an experiment that alters the status quo: risks to eagles, Native Americans, and to non-Native American adherents whose entitlement to eagle feathers may be of only too brief duration. But in an equation in which all the variables are changing and subject to a degree of uncertainty it is unlikely that a court—or legislature or administrative agency—could fashion an adamantine and eternal solution that will allocate scarce resources appropriately for all time. RFRA requires that the government employ the least restrictive means when it substantially burdens a person's free exercise of religion, and the government has not shown that it has employed the least restrictive means at this time.

## Conclusion

Under the current system, enrolled members of federally recognized tribes may apply to the Repository for the feathers necessary to perform the rituals that form part of their faiths. While they must wait their turn and eventually receive feathers that may be less than perfect, the government comes at least some of the way toward meeting their religious needs without

neglecting its responsibilities to maintain the recovery of eagle populations.  Non-Native American adherents to the very same religions, however, are not only ineligible to apply to the Repository, but are subject to criminal prosecution if they possess eagle feathers at all.[16]  In justification of continuing such discrimination, the government offers its efforts to promote two compelling and competing interests.  Neither is sufficient at this time to justify the means the government continues to employ.  The government has demonstrated its confidence in the resilience of newly-recovered eagle populations by delisting them.  As for the survival of Native American religions and the likely demand for feathers, the only evidence the government has offered suggesting prohibitively high demand from Native American or non-Native American adherents is either not relevant to this case or is based on testimony not credible for several reasons and inconsistent with other government evidence of a less speculative nature.  There is therefore no credible evidence that either of the interests the government seeks to protect requires measures so restrictive as the ban on possession by non-Native American adherents to Native American religions.  The government has therefore failed to shoulder its burden of demonstrating that the ban is the least restrictive means of furthering its compelling interests, and the prosecution of Messrs. Wilgus and Hardman under the statutes accordingly falls afoul of RFRA.

It is so ordered.

DATED this 13th day of February.

Dee Benson
United States District Judge

---

[16]It is true that non-Native American adherents to Native American religions may legally possess pre-Act feathers, but these feathers are necessarily in short supply, and their (largely theoretical) existence does little or nothing to ease the burden of the ban on possession.

44